Scates, Justice, delivered the dissenting opinion of himself and Treat, Justice: We are of opinion that the decree of the court below ought to be reversed, and a decree entered for the complainant, according to the prayer of the bill. There is no innocent purchaser to be affected by it. The defendants were creditors of Burlingame, except the sheriff, Bryant, before this purchase of Henshaw, "and did not trust him upon the possession and apparent ownership of these goods. So the question is open between the complainant and defendant Burlingame, as to the fairness of this transaction; and if fraud intervened in this sale, it ought to be declared and held void, and the goods restored. We do not differ with the court in the principles of law laid down, except as to one position. It is purely a question of fact; and we only dissent as to the question whether the facts in evidence disclose a fraudulent purchase. The chancellor, in the case of Durrell v. Haley, 1 Paige 492, decides, that if a purchaser, who is insolvent, concealing his insolvency from the vendor, obtains goods from him without intending to pay for them, it is a fraud upon the ven- [*110] dor, and the property in the goods will not be changed. The case of Rowley v. Bigelow, 12 Pick. 311, is, we think, even a stronger case than the one before us. The plaintiff introduced witnesses, merchants of New York, where the plaintiff and Martin, the purchaser, also lived, who testified that Martin had made similar purchases of them about the same time, and under circumstances tending to show that he was insolvent; and that he knew it, and had no reasonable expectation of paying for the merchandise, according to his contract. The court, in remarking upon this evidence, says, “ It tends to show, that at the time this ostensible purchase was made,'Martin was insolvent; that he knew he was insolvent; that he had no reasonable ground to believe that he could pay the cash, and did not expect or intend ■ to pay the cash for the merchandise which he purchased; and so that he obtained the goods by false pretences. The fact of insolvency, of his knowledge of his insolvency, and that he had no expectation or intention of paying for the corn in question, is a material fact, and the principal fact in controversy, on which this case rests, and is material to the issue. The evidence bears upon the question, quo animo, the intent, the fraudulent purpose.” There was in that case a delivery, and the court held the property did pass, but subject to be redelivered, if the contract was avoided by fraud. The rights of a subsequent bona fide purchaser without notice intervened, and upon that ground the decision turned. The purchase of the goods is clearly shown, to the amount of $5685.52, of complainant; and to the amount of $583, of a Mr. Bartlett, at the same time; making in all the sum of $6268.52. These goods were sold to the defendant, upon his own responsibility; without security. Now it is material to enquire, What was the true condition of the defendant Burlingame at the time of this purchase ? What means did he use to induce the complainant to credit him ? What were the complainant’s means of information? Did the plaintiff use due caution to protect himself against fraud ? First, then, as to Burlingame’s condition at. the time 'of this purchase. He made out a schedule at the request of Mr. Gifford, his agent, to make the purchases, purporting to show the whole amount of his real and personal property, and also all the debts he owed. The latter he sets down at $7307.04, but which did not contain two debts amounting to $2500. This would make an aggregate of $9807.04, his indebtedness at the time of making the schedule, and the purchase. According to the estimate of the witnesses, the aggregate value of all his lands, goods, and debts, at that time, was $5450, leaving a balance of indebtedness above his means, of $4357.04, the extent of his insolvency at the time of purchase. [*111] Secondly. What means did he use to obtain credit? He employed Mr. Gifford to make these purchases for him in the east, to whom he represented himself to be worth nearly $10,000, above his liabilities. Gifford was comparatively a stranger to him, his condition and affairs. He was sending him amongst strangers to both, to make purchases. Gifford requested a statement of his condition to exhibit to merchants, showing his property and debts. He accordingly made out the schedule, intending it to be used for that purpose, showing property, stock in trade, etc., to the amount of $16,000, but which, upon a fair valuation by witnesses, is only worth $5450, showing an excess of means of $10,550. He also stated the whole of his debts to amount to $7307.04, while it is shown by the witnesses, that he owed $9807.04 — thus showing a difference between his represented means and actual means, of $10,550, and a difference between his represented debts and actual debts of $2500. He showed himself by this statement to be worth $8692.96, after paying all his debts; while he was at the same time insolvent by $4357.04— thus showing the difference between his represented condition and actual condition, of $13,050. Every man ought, and is presumed to know, his condition as to property and debts. If this presumption is to be indulged, within a reasonable degree of certainty, he must have known that he was insolvent to a considerable amount. With this knowledge of his circumstances, he made this false statement of his condition to be exhibited to those of whom he might wish to purchase by his agent. We cannot resist the conviction, that he made out this statement with intent to deceive. We cannot believe he could have been so much mistaken. A merchant residing in the interior, and doing but a limited business, could not be so much mistaken, if he was capable of doing business at all. . Thus furnished with false statements, knowingly made, his agent, Gifford, being himself also deceived as to his true condition, applied to the complainant, a merchant in Boston, some fifteen hundred miles distant from Burlingame, to purchase goods. This false statement was exhibited, backed by the assurances of the agent, that Burlingame was an honorable man, and would not deceive, and that agent believed him to be worth near $10,-000 above his debts. Too remote from Burlingame’s residence, to make any inquiry, in. ordinary mercantile transactions, as to his character and condition, he sold the goods upon the credit of this statement, and these assurances. No ordinary or even extraordinary prudence and caution could protect Henshaw. There was no one acquainted with Burlingame, nearer than Illinois, except his own agent, of whom he could make inquiry. In mercantile transactions, the complainant would not be expected or required to wait to send to Illinois for information. He did all that a prudent man could be expected to do. [® 112] Burlingame made another purchase at the same time. Had he any reasonable expectation that he could pay for these goods within six and twelve months, when he was liable then to outstanding debts to the amount of near $10,000 ? So far from entertaining any such reasonable expectation, it seems to us that he never did intend,to pay for them. And as a further evidence of this, he promptly executed notes for the amount and forwarded them with assurances of prompt payment, when the amount of collectable debts upon his books did not exceed $400; promising at the same time to patronize his house, and directing, if he ordered more goods, to send'them by way of New Orleans. Thus he would lull his suspicions, and if chance offered, take more goods and further credit. ■ From these facts, therefore, we are clearly of opinion, that he made this purchase with a premeditated design to cheat and defraud, with no reasonable expectation of ever paying for them; and we feel warranted in saying that we believe he never intended to pay for them. The court lay down the principle, as contained in the books, that the fraud must be such as will be sufficient to sustain an indictment for false pretences. From this position we dissent. The authorities cited do not warrant the principle. Chitty lays down no such doctrine himself (Chit, on Con. 321) but refers to the case of Noble v. Adams, 7 Taunt. 59, in which chief justice Gibbs is made to lay down this rule; but it is for want of careful attention to the facts of the case upon which he was commenting, as is fully shown by Park, J., who was present at the pronouncing that judgment. He says, in the case of Irving v. Motley, 7 Bingham 543, “ I am anxious to remove the idea, that the court thought that nothing short of obtaining goods under false pre-tences would vacate a bargain; ” and after commenting upon that decision, and the facts in the case, showing that he intended to lay down no such rule, he adds: “ He, Ch. J. Gibbs, guarded himself against that conclusion, leaving it open to the particular circumstances of each case.” 20 Eng. Com. Law R. 233. In Lloyd v. Brewster, 4 Paige 541, the chancellor does not say that such fraudulent pretences must be shown as would sustain an indictment, but that such fraud was shown in that case, in the bill, as would subject the purchaser to imprisonment in the state prison, and that, therefore, he could follow the goods into the hands of air assignee without consideration. And we conceive the rule should not be so; as the quantum of evidence necessary to a conviction is greater than is necessary to maintain a civil action. The reason of the rule is, that in criminal cases, the prosecution is bound to establish the guilt beyond a reasonable doubt, and the jury are not permitted to find according [* 113] to the weight of testimony. But, in civil cases, they may find according to the weight of testimony. ' Therefore, in a civil case, evidence might warrant a verdict declaring a sale void for fraud where a reasonable doubt might demand an acquittal. We predicate our opinion upon the veracity of the witness Gifford, in deposingto the facts set forth in his^leposition. With-' out his testimony, the fraud is not made out. The court disbelieves him, and seems to discredit him, because in some instances, he knows too much, in others too little, and because he was aparticeps criminis, if fraud was committed. Gifford went to Peoria on the 5th of August, 1836 ; was employed as a clerk by Burlingame on the 7th, and on the 8th was so badly burned by Burlingame’s store taking fire, as to be unable to leave his room for near two months. He was then carried into the chamber of the store, where he remained some time ; but he so far recovered as to be able to hand out a few goods before he left for the east. Burlingame had told him that he had goods in another building, but Gifford had not been into it before he left for the east. The packages were injured by the fire; a great many wrapped in new papers, and a great many without labels. These are all circumstances which induce us to believe what he says, when he states that he did not know the amount of the stock, when he went east. He was a stranger; he was confined by burns, and unable to attend to business, so as to become acquainted with the stock; and above all, Burlingame told him he had other goods in another building. In this he is charged with knowing too little. But we think the account very reasonable and satisfactory, and altogether compatible with observation and experience amongst business men and their clerks, in similar circumstances ; and it would be considered impertinent in an agent, to push such inquiries into the condition and affairs of an employer. When he returned, he attended to the sales as a clerk ; became familiar with the stock and books; and upon the issuing of the attachments, had the books in his hands for collection. He soon discovered that Burlingame was insolvent; and that he owed debts, secured by mortgages on the property to the amount of $2,500. Here he is charged with, and disbelieved for, knowing too much. There were ample means of information as to the amount of stock, etc., etc. The cash book, and the other books of entries, if Burlingame kept such as merchants usually keep, would show his past as well as his present stock and transactions. From these data, he might well draw the conclusion as to the amount of his stock and collectable debts, as he had the books for collection. It is also objected that he knew of his insolvency, and bank debt, and mortgages, etc. How he got his information he is not asked. But it is not remarkable that such transactions should be known by strangers to them; but it is a lit- [* 114] tie remarkable, that the defendants should permit it to go uncontradicted, if it be not true. And it is still more remarkable that the defendant, Burlingame, introduced no proofs sustaining the statements made in his schedule, if it contained the truth; when its correctness is questioned by proof showing its falsehood to the amount of $13,000. Again: Gifford is charged with fraud, if fraud there be. He states that he believed the schedule to be true. Under the circumstances, and with his limited means of information, before he went east, he had no right to question it. But when he ascertained, upon his return, how grossly Henshaw had been imposed upon; and recollecting his own assurances of Burlingame’s honor, and his belief of his wealth, given to Henshaw, he conceived that he was himself liable ; and while laboring under that impression, and before he was better advised, he made-the several statements sworn to by the other witness. We cannot conceive how such false impressions can invalidate his testimony, given after the error was corrected, and his mind disabused of the impression of his own liability. It is supposed that Ward contradicts him. Ward does not recollect that such a schedule was exhibited, or any assurances were made. This is negative.' Gifford states it affirmatively; and Ward may not have known it, although true. Upon the same footing are the statements made by the other witness Howell, who says Gifford had such a conversation with him. Gifford does not recollect it, nor deny it. Such negative statements cannot impeach positive ones. He does not deny having made such statements; but admits having stated them in substance, while he believed the circumstances would charge him. This' erroneous impression cannot certainly destroy his credit; the less so when he frankly acknowledges that he thought so; that he made the statement under that impression; and also frankly states that he had changed his opinion. From the means of information possessed by him at the several times, as explained by him, and all the circumstances connected with him, we are bound to believe the witness’ testimony, and upon that, in connection with the other testimony, predicate our judgment in the case. We are therefore of the opinion that the decree ought to be reversed, and a decree entered for the complainant. Decree affirmed.